## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CENTER FOR BIOLOGICAL DIVERSITY,
P.O. Box 11374
Portland, OR 97211

              Plaintiff,

v.

U.S. FISH AND WILDLIFE SERVICE,
1849 C Street NW
Washington, D.C. 20240,

DEB HAALAND, in her official capacity as
Secretary of the U.S. Department of the Interior,
1849 C Street NW
Washington, D.C. 20240,

              *and*

MARTHA WILLIAMS, in her official capacity
as Director of the U.S. Fish and Wildlife Service,
1849 C Street NW
Washington, D.C. 20240

              Defendants.

Case No._____

**COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF**

## INTRODUCTION

1.  Plaintiff Center for Biological Diversity ("Center") challenges the unlawful

decision of the U.S. Fish and Wildlife Service ("Service") to deny Endangered Species Act

("ESA") protections to the Black Creek crayfish (*Procambarus pictus*). 86 Fed. Reg. 53933

(Sept. 29, 2021) ("not-warranted finding"). Defendants' failure to list the Black Creek

crayfish violated their mandatory duties under the ESA, 16 U.S.C. § 1533, and deprives the

species of critical protections that are necessary to ensure its continued survival and recovery.

2.      The Black Creek crayfish is among the most threatened aquatic invertebrates in the southeastern United States. It is a small to medium-sized crustacean with distinctive coloration consisting of a dark carapace parted by a bright white or yellow stripe, a rust-colored abdomen with black banding, and sides that feature white spots and streaks. The Black Creek crayfish represents an irreplaceable thread in its ecosystem's food web, scavenging on dead plant and animal material and providing food for numerous other native species.



Photo credit: U.S. Army Corps of Engineers

3.      The Black Creek crayfish lives only in the Lower St. Johns River Basin in northeastern Florida's Clay, Duval, Putnam, and St. Johns counties. It requires high-quality streams that are cool, flowing, sand-bottomed, tannic-stained, and highly oxygenated.

4.      The species is highly imperiled due to, among other threats, resource competition with the introduced white tubercled crayfish (*Procambarus spiculifer*) ("WTC"); water quality and quantity issues that stem from mining, agriculture, urbanization, and silviculture;

disease; and climate change, including sea level rise and severe weather events. Exacerbating the effects of these threats, the Black Creek crayfish is of highly limited distribution. As a result, the Service predicts that every remaining population could be impacted by a single catastrophic event.

5.      Concerned over its precipitous decline, fourteen years ago, on April 20, 2010, the Center and other conservation groups petitioned the Service to list the Black Creek crayfish as a threatened or endangered species under the ESA. On September 27, 2011, the Service concluded that the petition presented substantial information indicating that listing the species may be warranted. However, ten years later, on September 29, 2021, the Service published a "not warranted" finding for the Black Creek crayfish, denying the species ESA protections. 86 Fed. Reg. 53933.

6.      In finding that the Black Creek crayfish is not threatened or endangered, the Service flouted the ESA's mandate that the agency rely solely on the best available science when making listing determinations by disregarding several of the primary threats facing the species.

7.      For instance, despite agreement among its own species experts that the rapidly-expanding WTC is completely replacing Black Creek crayfish populations wherever the WTC invades, the Service failed to consider the current and projected impacts the WTC will have on the Black Creek crayfish, despite projections showing that at least 79% of Black Creek crayfish populations are likely to be extirpated within the foreseeable future under current WTC-occupancy and urbanization trends. The Service also chose not to consider the impacts of disease even though several diseased Black Creek crayfish have been found and WTC invasion is known to increase disease risk.

8.      The Service likewise discounted the threat of climate change-induced weather events, such as drought and storms, despite its own finding that climate change has already led to increased water temperatures in streams occupied by the Black Creek crayfish that surpass the species' temperature tolerances.

9.      Further, the Service repeatedly relied on uncertain and unproven conservation actions to support its not-warranted finding. For instance, instead of meaningfully evaluating threats to water quality, the Service vaguely pointed to "ongoing conservation actions" that are allegedly protecting the species and assumed that populations on federal and state lands are particularly resilient despite ongoing declines across a vast majority the Black Creek crayfish's range, including on these public lands.

10.      Compounding its errors, the Service produced a flawed analysis to determine whether the species is threatened or endangered in a significant portion of its range—an independent basis for listing the Service is required to analyze. The agency applied the incorrect statutory standard and rested its analysis on the false legal and factual premise that none of the threats facing the Black Creek crayfish are geographically concentrated in any portion of its range. The evidence before the agency, however, indicates that several threats are concentrated in certain habitat areas, including logging, mining, urbanization, agriculture, and the negative effects associated with small, isolated populations.

11.      For these and additional reasons, the Service's not-warranted finding for the Black Creek crayfish fails to follow the best available science, violates the ESA, and is arbitrary and capricious. To remedy these violations, the Center seeks an order vacating the Service's not-warranted finding and remanding the matter to the Service to issue a new

finding regarding whether the Black Creek crayfish warrants protection under the ESA as an endangered or threatened species by a date certain.

## **JURISDICTION AND VENUE**

12.     Plaintiff brings this action pursuant to the ESA citizen suit provision, 16 U.S.C. § 1540(g), and the Administrative Procedure Act ("APA"), 5 U.S.C. § 702, which waive Defendants' sovereign immunity.

13.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction); 28 U.S.C. §§ 2201–2202 (declaratory judgments and further relief); 16 U.S.C. § 1540(c) (district court jurisdiction); 16 U.S.C. § 1540 (g)(1)(C) (action arising under the ESA citizen-suit provision); and 5 U.S.C. §§ 702–704 (APA).

14.     Venue is proper in the District of Columbia pursuant to 16 U.S.C. § 1540(g)(3)(A) and 28 U.S.C. § 1391(e), as this civil action is brought against an agency of the United States and officers and employees of the United States acting in their official capacities and under the color of legal authority, and because no real property is involved in this action. Plaintiff also maintains an office in this judicial district.

15.     Pursuant to the ESA citizen suit provision, Plaintiff provided the Secretary of the U.S. Department of the Interior, the Director of the Service, and the Service with 60 days' notice of intent to sue for ESA violations on November 20, 2023, more than 60 days prior to the filing of this Complaint.

## **PARTIES**

16.     Plaintiff CENTER FOR BIOLOGICAL DIVERSITY is a national, non-profit conservation organization that works through science, law, and the media to protect imperiled species and their habitats. The Center has more than 79,000 members, including many who

live and recreate in the Black Creek crayfish's historic range. The Center is headquartered in Tucson, Arizona, with offices throughout the United States, including in Florida.

17.     Plaintiff brings this action on behalf of its staff and members who maintain professional, scientific, moral, recreational, and other legally protected interests in the Black Creek crayfish and its habitat.

18.     For example, one Center member is a biologist who regularly recreates in the Black Creek crayfish's habitat and will continue to do so. This member worked extensively on the species in a professional capacity and has an ongoing interest in studying and observing the species. The member is very concerned about the Black Creek crayfish's rapid decline and what the species' extinction would mean for the ecosystem in which it lives.

19.     The Service's decision to deny ESA protections to the Black Creek crayfish has caused Plaintiff's members to suffer a concrete and particularized injury that is actual and imminent. Without the protections provided by listing the Black Creek crayfish as an endangered or threatened species pursuant to the ESA, the species will likely continue to decline towards extinction, and Plaintiff's members will continue to suffer injury unless the relief sought in this Complaint is granted.

20.     Defendant UNITED STATES FISH AND WILDLIFE SERVICE is a federal agency within the Department of the Interior. The Secretary of the Interior has delegated to the Service the authority to administer the ESA for non-marine species. 50 C.F.R. § 402.01(b). This authority encompasses findings, and proposed and final listing determinations for the Black Creek crayfish.

21.     Defendant DEB HAALAND is the Secretary of the Interior ("Secretary") and has the ultimate responsibility to administer and implement the provisions of the ESA regarding

the Black Creek crayfish, and to comply with all other federal laws applicable to the U.S.

Department of the Interior. Plaintiff sues Defendant Haaland in her official capacity.

22.     Defendant MARTHA WILLIAMS is the Director of the U.S Fish and Wildlife

Service and is charged with ensuring agency decisions comply with the law. Plaintiff sues

Defendant Williams in her official capacity.

## STATUTORY AND REGULATORY BACKGROUND

### The Endangered Species Act

23.     The ESA "represent[s] the most comprehensive legislation for the preservation of

endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180

(1978). The "plain intent of Congress in enacting [the ESA] was to halt and reverse the trend

toward species extinction, whatever the cost." *Id.* at 184.

24.     The statute seeks to "provide a program for the conservation of … endangered

species and threatened species" and "to provide a means whereby ecosystems upon which

endangered species and threatened species depend may be conserved." 16 U.S.C. § 1531(b).

The ESA requires that "all Federal departments and agencies … seek to conserve endangered

species and threatened species and … utilize their authorities in furtherance of the purposes"

of the statute. *Id.* § 1531(c)(1).

25.     The ESA protects imperiled species only if the Service lists them as threatened or

endangered. Once a species is listed, they receive numerous substantive protections. For

example, section 7 of the ESA requires all federal agencies to ensure that their actions do not

"jeopardize the continued existence" of any listed species or "result in the destruction or

adverse modification" of a listed species' "critical habitat." *Id.* § 1536(a)(2). Section 9 of the

ESA prohibits, among other things, "any person" from intentionally or incidentally "taking"

listed species without a lawful authorization from the Service. *Id*. §§ 1538(a)(1)(B), 1539.

Other provisions require the Service to designate "critical habitat" for listed species, *id*. §

1533(a)(3); to "develop and implement" recovery plans for listed species, *id*. § 1533(f); and

authorize the Service to make federal funds available to states to assist their efforts to preserve

and protect threatened and endangered species. *Id*. § 1535(d).

26.     The ESA defines a "species" as "any subspecies of fish or wildlife or plants, and

any distinct population segment of any species of vertebrate fish or wildlife which interbreeds

when mature." *Id.* § 1532(16).

27.     The ESA requires the Service to determine whether any species is endangered or

threatened because of any of the following factors: (A) the present or threatened destruction,

modification, or curtailment of its habitat or range; (B) overutilization for commercial,

recreational, scientific, or educational purposes; (C) disease or predation; (D) the inadequacy

of existing regulatory mechanisms; or (E) other natural or manmade factors affecting its

continued existence. *Id*. § 1533(a)(1).

28.     If a species meets the definition of "endangered" or "threatened" because of any

one or a combination of these five factors, the Service must list the species. *Id*.; 50 C.F.R. §

424.11(c). In evaluating these factors, the Service must make listing determinations "solely on

the basis of the best scientific and commercial data available." 16 U.S.C. § 1533(b)(1)(A).

29.     A species is "endangered" when it "is in danger of extinction throughout all or a

significant portion of its range." *Id.* § 1532(6). A species is "threatened" when it is "likely to

become an endangered species within the foreseeable future throughout all or a significant

portion of its range." *Id*. § 1532(20).

30.     Under this plain language, if the Service concludes that a species is endangered throughout all of its range, the inquiry ends and the Service must publish a proposed rule to list the species as endangered in the Federal Register. *Id*. § 1533(b)(5).  If the Service determines that the species is neither endangered nor threatened throughout all of its range, the ESA then requires the agency to examine whether it is endangered or threatened throughout any *significant portion* of that range. And if the Service determines that the species is threatened but not endangered throughout all of its range, it must still examine whether the species is *endangered* in any significant portion of its range.

31.     The ESA does not define what constitutes a "significant portion" of a species' range. In 2014, the Service promulgated a "Final Policy on Interpretation of the Phrase 'Significant Portion of Its Range' in the ESA's Definitions of 'Endangered Species' and "Threatened Species.'" 79 Fed. Reg. 37578 (July 1, 2014) ("SPR Policy").

32.     The SPR Policy directs the Service to determine whether: (1) the portions may be significant; and (2) the species may be in danger of extinction in those portions or is likely to become so in the foreseeable future. The Service may answer these questions in any order, and if both questions are answered in the affirmative, the agency must list the species as endangered or threatened. If either question is answered in the negative, however, that is the end of the inquiry. As part of this analysis, the SPR policy directs the Service to consider whether any threats facing the species are geographically concentrated in some manner.

33.     The requirement that the Service rely on the "best scientific and commercial data *available*," 16 U.S.C. § 1533(b)(1)(A) (emphasis added), means that the Service must act based on the science available to the agency, and cannot dismiss threats to or refuse to list a species based on uncertainty alone. Congress' intention in allowing the Service to list a

species as threatened based on the best scientific data available, instead of requiring scientific certainty, was for the Service to act and provide ESA protections to imperiled species before they stood on the brink of extinction and beyond any likely hope of recovery. *See* H.R. Rep. No. 412, 93d Cong., 1st Sess. 5 (1973) ("In the past, little action was taken until the situation became critical and the species was dangerously close to total extinction. This legislation provides us with the means of preventive action.") (remarks of Rep. Clausen); *id.* ("By heeding the warnings of possible extinction today, we will prevent tomorrow's crisis.") (remarks of Rep. Gilman).

34.     Any interested person can initiate the listing process by filing a petition with the Service to list a species as endangered or threatened. 16 U.S.C. § 1533(b)(3)(A); 50 C.F.R. § 424.14(a).

35.     Upon receiving a petition to list a species, the Service has 90 days to determine whether the petition "presents substantial scientific or commercial information indicating that the potential action may be warranted." 16 U.S.C. § 1533(b)(3)(A); 50 C.F.R. § 424.14(h)(1). This determination is known as a "90-day finding."

36.     If the Service makes a positive 90-day finding in response to a petition, it must publish that finding in the Federal Register and proceed with a scientific review of the species' status, known as a "status review." 16 U.S.C. § 1533(b)(3)(A).

37.     Upon completing the status review, and within 12 months of receiving the petition, the Service must publish one of three findings: (1) listing is "warranted"; (2) listing is "not warranted"; or (3) listing is "warranted but precluded" by other proposals for listing species, provided certain circumstances are met. *Id*. § 1533(b)(3)(B).

38.     If the Service issues a finding that listing the species is "warranted," it must publish a proposed rule to list the species as endangered or threatened in the Federal Register. *Id*. § 1533(b)(5). Within one year of publishing a proposed rule to list a species, the Service must issue a final rule listing the species and designating critical habitat for it. *Id*. § 1533(a)(3), (b)(6)(A), (C).

39.     If the Service issues a finding that listing the species is "not warranted," that finding is a final agency action subject to judicial review. *Id.* § 1533(b)(3)(C)(ii).

### The Administrative Procedure Act

40.     Under the APA's standard of review, a court must hold unlawful and set aside "agency actions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This standard of review applies to claims brought under the citizen suit provision of the ESA.

41.     An agency's action is arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

### FACTUAL BACKGROUND

### The Black Creek Crayfish and Threats to Its Continued Existence

42.     The Black Creek crayfish is a small to medium-sized crustacean with a dark carapace that is parted by a bright white or yellow dorsal stripe and dark claws that each have ten bumps. Its abdomen is rust colored with black banding and its sides feature white spots,

streaks, or flecks. The Black Creek crayfish likely lives no longer than sixteen months, and each female produces just one clutch of eggs in her lifetime.

43.     Native crayfish are among the most important links in an ecosystem's aquatic food chain. The Black Creek crayfish scavenges on dead plants, animal material, and detritus, and provides food for numerous other species such as softshell and snapping turtles, fish, birds, and raccoons. During daylight hours it is found sheltering in tree roots, in detritus accumulations on stream bottoms, or downstream from submerged logs.

44.     The Black Creek crayfish is adapted to living in high-quality streams that are cool, flowing, sand-bottomed, tannic-stained, and highly oxygenated. It prefers small headwater streams to larger downstream areas and is highly sensitive to pollutants and warming water temperatures.

45.     The Black Creek crayfish is known to occur only in Florida's Clay, Duval, Putnam, and St. Johns counties, all located in the Lower St. Johns River Basin. Given its limited distribution, small numbers, and inability to traverse large water bodies, habitat connectivity is important for preventing inbreeding depression.

46.     The Black Creek crayfish's habitat extends across private, state, federal, and municipality-managed land. A large amount of its habitat occurs on land owned by the Florida Forest Service and the Florida Army National Guard. Activities occurring on Florida Forest Service lands include logging and road construction. Camp Blanding Joint Training Center ("Camp Blanding") is a large military training facility that regularly conducts live weapons training, including the exploding of munitions, into habitat areas, and leases land to large-scale heavy metal mining operations.

47.     The Black Creek crayfish is in rapid decline and is listed by the state of Florida as a threatened species. It is also listed as a Florida Species of Greatest Conservation Need and is ranked as "critically imperiled" by NatureServe.

48.     The species' decline is due in part to resource competition with WTC, an invasive species that was recently introduced to its habitat. Non-native crayfish are known to impact native crayfish by altering native plant life and local food webs and by introducing disease and pathogens. According to the Service in its 2020 Species Status Assessment ("SSA"), which compiles the alleged best available science regarding the Black Creek crayfish, of 28 sites known to have historically been occupied by the Black Creek crayfish between 1976 and 2011, just 36% were still occupied in 2019, and WTC had completely supplanted Black Creek crayfish at 46% of the sites. Since the production of the SSA this trend has continued—in 2021, of 56 historically occupied Black Creek crayfish sites, Black Creek crayfish were present without WTC at just 8 (14%), and WTC had completely replaced the species at 27 (48%) of the sites. It is possible that WTC are more tolerant of poor water conditions and are able to outcompete Black Creek crayfish for food and space due to their larger size. And unlike the Black Creek crayfish, the WTC reproduces multiple times in its life and can more quickly colonize rehydrated streams after severe drought. It is thought that the two species can co-exist for only a short time before the Black Creek crayfish is completely replaced by WTC.

49.     Black Creek crayfish are also imperiled by water withdrawal and other impacts to water quantity and quality. Water withdrawal occurs in the species' range to serve residential, agricultural, recreational, industrial, and commercial uses. The Suwannee River Water Management District projects increases in water usage by up to 51% for three of the four counties in which the Black Creek crayfish occurs, with additional substantial increases

predicted for drought years. Further, the Black Creek Resource Development Project, currently in development, will transport at least 10 million gallons of water per day from the South Fork of Black Creek—located on Camp Blanding land and historically occupied by the Black Creek crayfish—to a residential lake community.

50.     Reductions in water quantity worsen existing water quality issues that imperil the Black Creek crayfish. Pollution from urbanization, mining, agriculture, logging, and runoff from roads and road construction kills the species directly and degrades habitat relied upon at every life stage.

51.     Further, climate change poses its own threats to the Black Creek crayfish and acts synergistically to worsen others. Increasing temperatures and decreasing precipitation cause water to warm, resulting in lower dissolved oxygen levels and more concentrated pollutants as well as longer and more intense periods of drought. Because the Black Creek crayfish has narrow tolerance for warm water, climate change can cause decreased survival, lower growth rates, and unsuccessful reproduction—indeed, the species has already been extirpated from streams where water temperatures are now greater than 30°C (86°F), and some historically occupied sites have dried up completely. Sea level rise also poses a threat to the Black Creek crayfish because it could cause habitat inundation, shifts in the vegetation communities that support the species, and saltwater intrusion of groundwater, which increases salinity and decreases oxygen levels.

52.     Compounding these threats, because the species exists in low numbers and is of limited distribution, it is particularly vulnerable to population-level effects of random events, such as severe weather, disease outbreaks—the risk of which is increased by invasive species

and poor water quality—and years of low reproduction. Indeed, the Service predicts that every remaining population of the crayfish could be impacted by a single catastrophic event.

### The Species Status Assessment for the Black Creek Crayfish

53.     In response to the threats facing the Black Creek crayfish, on April 20, 2010, the Center and other conservation groups petitioned the Service to list the species as threatened or endangered under the ESA. On September 27, 2011, the Service published a 90-day finding that the petition presented substantial information indicating that listing the species may be warranted.

54.     Ten years later, following litigation by the Center to compel the Service to make the required 12-month finding for the Black Creek crayfish, in 2021, the Service completed the SSA to compile the alleged best available science regarding the species.

55.     The SSA assessed the Black Creek crayfish's current population status and future viability. The Service defines "viability" as the species' ability to sustain populations in the wild over time. U.S. Fish & Wildlife Service 2020, Black Creek Crayfish (*Procambarus pictus*) Species Status Assessment, Version 1.0, at 23.

56.     To assess viability, the SSA analyzed the "3Rs"—a species' resiliency (ability to withstand stochastic events), representation (ecological diversity across the species' range and ability to adapt to changing conditions), and redundancy (ability to withstand catastrophic events). In doing so, the SSA—which, while produced by the Service, is not itself a decision document—paints a grim picture of the Black Creek crayfish's viability, finding that even without considering several threats to the species, just four of its nineteen populations are likely to remain in the foreseeable future under current urbanization and WTC habitat occupation trends, a decline of 79%.

57.     The Service delineated Black Creek crayfish populations using occurrence records, presuming that if crayfish had been observed from 2008 to 2020 in a watershed unit, a population was present in that unit. The Service identified nineteen extant Black Creek crayfish populations, all located in tributaries and lakes within the lower St. Johns River Basin. These nineteen remaining populations are bisected by the St. Johns River, with three populations occurring on the east side of the river and sixteen on the west side.

58.     To assess the current resiliency of each population, the Service aggregated the following factors: "likely habitat" within each occupied watershed, riparian health and water quality, protections associated with land ownership status, and WTC occupancy of Black Creek crayfish habitat.

59.     The Service then produced a second assessment of current resiliency where WTC occupancy was *not* included as a viability factor, asserting this was necessary because "it is unclear if [WTC] have a significant effect on abundance or occupancy." SSA at 53. Black Creek crayfish experts cited by the agency, however, are in firm agreement that WTC are driving the species' steep decline.

60.     Both resiliency assessments considered "protected habitat" to be any habitat that occurs on federal and state-owned lands or within "conservation areas," such as conservation easements, mitigation banks, and land owned by the St. Johns River Water Management District. The Service assumed that land ownership status reflects reduced threats to habitat quality regardless of whether management on these lands is geared toward conserving the Black Creek crayfish or its habitat.

61.     The Service concluded that of the nineteen extant populations, 47% currently have high or very high resiliency. Four of these populations were determined to have high

resiliency regardless of WTC presence due to assumed benefits stemming from their existence on lands that are "generally protected." SSA at 70. For five (26%) of the populations, the assessment that incorporated WTC impacts resulted in lower resiliency scores than did the assessment that assumed no risk from WTC invasion.

62.     To estimate the Black Creek crayfish's future viability, the Service "reviewed the factors that are driving the current and future conditions of the species." SSA at 75. The agency asserted those factors to be sea level rise, urbanization, and WTC expansion.

63.     For WTC impacts, the Service again included scenarios where WTC expansion results in impacts to Black Creek crayfish abundance—i.e., follows current trends—as well as hypothetical scenarios where, despite all available evidence pointing to the contrary, WTC expansion presents zero risk to the Black Creek crayfish.

64.     In its analysis of future urban development impacts, the Service used both current trend data and "alternative" data that represented urbanization projections under a scenario where there is an increase in protected lands rather than a continuation of the status quo.

65.     The Service estimated that in 2070, under current trends for development and WTC impacts, just four of the nineteen remaining Black Creek crayfish populations will escape extirpation, representing a decline of 79%. Should development proceed under a more compact pattern with a hypothetical increase in land that is protected from urbanization, the Service estimated that eight populations would remain, representing a decline of about 58%. The Service, however, provided no evidence that a more compact pattern of development is likely to occur.



Figure 1. Predicted future crayfish population resiliency in 2070 under current trend development scenario without consideration of impacts from WTC (left) and with WTC impacts (right). Black shading indicates likely extirpation. SSA at 85.

66.     In addition to the unwarranted exclusion of WTC impacts from two of the future scenarios, none of these viability projections accounted for the effects of several other key threats, including the impacts of climate change-induced weather events like drought and storms, the Black Creek Water Resource Development Project, silviculture, mining, agriculture, impacts from military training operations, the effects of small population size, and disease.

**The Species Assessment and Listing Priority Assignment Form and Not-Warranted Finding for the Black Creek Crayfish**

67.     Despite the bleak outlook painted in the SSA, on September 29, 2021, the Service published a "not warranted" determination for the Black Creek crayfish, denying the species ESA protections. 86 Fed. Reg. 53933.

68.     In support of its not-warranted determination, the Service prepared a separate Species Assessment and Listing Priority Assignment Form ("SAF") for the Black Creek crayfish. Unlike the SSA, which is not a decision document and does not result in a recommendation regarding whether the Black Creek crayfish warrants listing as an endangered or threatened species, the SAF is a decision document that incorporates information from the SSA and concludes with the Service's "finding" as to whether the species is threatened or endangered in all or a significant portion of its range.

69.     In contrast to the SSA, the SAF and not-warranted determination did not consider any current or future resiliency scenarios that included impacts from WTC. The Service asserted this is because while the SSA analyzed WTC impacts "based on currently available knowledge and input from species experts," "further studies are necessary to test these assumptions." SAF at 36. The Service pointed to the co-existence of WTC and Black Creek crayfish in some habitat areas as evidence that WTC may not necessarily lead to the replacement of Black Creek crayfish. However, the replacement of Black Creek crayfish does not occur immediately upon the invasion of the WTC—rather, the evidence before the agency suggests that the species can co-exist for some amount of time but that the Black Creek crayfish will eventually be extirpated from WTC-invaded areas.

70.     By failing to consider the best available science regarding WTC impacts, the Service based its finding on current and future resiliency projections that run counter to the evidence before the agency.

71.     The current resiliency scores relied on by the Service in its finding were not only flawed in that they excluded WTC impacts but also because they were largely based on the unproven assumption that any existing protective measures present on state, federal, and water district lands are effective in conserving habitat quality. This assumption resulted in the Service's failure to meaningfully evaluate several threats to the species.

72.     For instance, the Service asserted that logging, mining, and agriculture are "*primary threats* [that] are continuing to impact the Black Creek crayfish by degrading its habitat," SAF at 34 (emphasis added), but then brushed those threats away, referencing without specificity "significant ongoing conservation actions that are protecting the Black Creek crayfish." SAF at 34. As the Service's own scientists pointed out in the SSA, though, "no range-wide conservation actions have yet been undertaken for the Black Creek crayfish." SSA at 44.

73.     Moreover, in direct conflict with its assertion that mining is an ongoing, "primary" threat to the species, SAF at 34, the Service stated it eliminated mining impacts from its analysis because "the data do not indicate either that it is currently a primary threat to the species or that the future condition would change." SAF at 11–12. The Service simply cannot reconcile these two statements in light of several ongoing mining operations in the Black Creek crayfish's range, including on the very lands the Service deemed "protected" throughout its analyses.

74.     Live munitions training and water withdrawal projects are also threats that occur on so-called protected land. The Service, however, fails to rationally explain why these threats do not threaten the crayfish's continued existence.

75.     Further, in its analysis of future urbanization impacts, the Service incorporated into the Black Creek crayfish's future viability analysis uncertain conservation measures, i.e., "scenarios that include development with added protections," SAF at 30, then pointed to those hypothetical measures to support its not-warranted finding. The ESA, however, prohibits the Service from resting listing decisions on uncertain conservation measures.

76.     The Service also completely eliminated disease from its analysis, citing a lack of data despite the SSA stating that disease represents a threat to the Black Creek crayfish's viability. Indeed, several individuals with microsporidian disease—a "highly contagious and often fatal" pathogen—have been reported, SSA at 42, and the presence of WTC is known to increase the threat.

77.     And while the SSA contains multiple pages acknowledging the grave impacts that climate change is already having on the species, including its extirpation from streams with high water temperatures as well as the deleterious effects that drought and severe storms will have on populations going forward, the Service did not consider these threats when making its finding. Instead, it decidedly ignored them, pointing to alleged uncertainty about specific impacts. Under the ESA, the Service must explain why uncertainty supports its listing decision.

78.     These errors allowed the Service to conclude that the Black Creek crayfish does not warrant listing as an endangered or threatened species because, allegedly, 15 of the 19

remaining populations "have moderate to very high baseline resiliency[,]" and "are expected to maintain at least some level of moderate resiliency under all future scenarios." SAF at 35.

79.     In its Status Throughout a Significant Portion of Its Range ("SPOR") analysis, the Service found that the Black Creek crayfish is not threatened or endangered in a significant portion of its range because, due to the proximity of its populations, the Service found "no concentration of threats in any portion of the Black Creek crayfish's range at a biologically meaningful scale." SAF at 38. The Service declined to analyze the issue further despite its admission in the SSA that "[i]nfluences on Black Creek crayfish viability vary by location." SSA at 24.

80.     For instance, the Service expects that WTC are unable to traverse the St. Johns River, which would mean that the three Black Creek crayfish populations on the east side of the river may not be at risk of WTC invasion, while all watersheds west of the river could be occupied by 2050 and subsequently extirpated. SSA at 76.

81.     The Service also asserted that populations on the east side of the river have lower resiliency and redundancy than populations on the west side—according to the agency, the west side contains nine populations that exhibit high or very high resiliency, while the east side contains zero.

82.     Other threats are also not uniform across its range including sea level rise, urbanization, mining, agriculture, and logging.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### Violations of the ESA and APA

***The Service's Conclusion that the Black Creek Crayfish Does Not Warrant Listing Under the ESA is Arbitrary and Contrary to the Best Available Science***

83.     Plaintiff realleges and incorporates by reference the preceding paragraphs.

84.     The Service "shall … determine whether any species is an endangered species or a threatened species" throughout all of its range because of any one or combination of five listing factors. 16 U.S.C. § 1533(a)(1). When doing so, the Service must rely "solely on the basis of the best scientific and commercial data *available*." 16 U.S.C. § 1533(b)(1)(A) (emphasis added).

85.     Under the APA, a reviewing court "shall hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency's decision is arbitrary and capricious if the agency entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

86.     The Service failed to rely on the best available science when it found that listing the Black Creek crayfish as a threatened or endangered species is not warranted because it excluded or dismissed key threats to the species' continued existence, incorporated flawed assumptions, and relied on uncertain and unproven conservation measures.

87.     The Service failed to provide a rational connection between the facts before the agency and its decision not to list the Black Creek crayfish as a threatened or endangered species throughout all or a significant portion of its range.

88.     Accordingly, the Service's determination that the Black Creek crayfish does not warrant listing as an endangered or threatened species throughout its range is contrary to the best available science, dismisses threats that warrant protection, violates the ESA, and is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the law. 16 U.S.C. § 1533; 5 U.S.C. § 706(2)(A).

## SECOND CLAIM FOR RELIEF

### Violation of the ESA and APA

#### *The Service's Significant Portion of the Range Analysis Is Unlawful*

89.     The Center realleges and incorporates by reference the preceding paragraphs.

90.     A species is "endangered" if it is "in danger of extinction throughout all *or a significant portion of its range*," and "threatened" if it "is likely to become an endangered species within the foreseeable future throughout all *or a significant portion of its range*." 16 U.S.C. § 1532(6), (20) (emphasis added).

91.     The Service found that the Black Creek crayfish is not endangered or threatened in a significant portion of its range because, due to the proximity of its populations, there is "no concentration of threats in any portion of the Black Creek crayfish's range at a biologically meaningful scale." SAF at 38.

92.     This analysis violates the ESA because it applies the wrong standard and because many of the threats facing the Black Creek crayfish are indeed concentrated in portions of its range.

93.     First, nothing in the ESA requires that threats be concentrated in a particular area for a species to be threatened or endangered in a significant portion of its range. The statutory standard the Service is required to apply in its determination focuses on the species' conservation status; that is, whether the Black Creek crayfish is *endangered or threatened* throughout all or a significant portion of its range. 16 U.S.C. § 1532(6), (20) (emphasis added).

94.     Second, even if the Service's "concentration of threats" approach was consistent with the ESA, the Service's significant-portion-of-its-range analysis for the Black Creek crayfish disregarded the best available science and is undercut by the agency's own findings that numerous threats are geographically concentrated within the Black Creek crayfish's range.

95.     The Service's determination that the Black Creek crayfish is not threatened or endangered in a significant portion of its range is therefore arbitrary and contrary to the best available science.

96.     Accordingly, the Service's not-warranted finding violates the ESA and is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the law. 16 U.S.C. § 1533; 5 U.S.C. § 706(2)(A).

## **REQUEST FOR RELIEF**

THEREFORE, Plaintiff respectfully request that this Court:

(1) Declare unlawful, set aside, and vacate Defendants' not-warranted finding;

(2) Remand the not-warranted finding to Defendants for further analysis and order the Service to issue a new listing determination by a date certain that is consistent with the ESA, APA, and this Court's order;

(3) Award Plaintiff reasonable attorneys' fees, costs, and expenses; and

(4) Grant Plaintiff such further and additional relief as the Court may deem just and proper.

DATE: February 16, 2024

Respectfully submitted,

*/s/ Ryan Adair Shannon*
Ryan Adair Shannon (D.C. Bar No. OR0007)
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 11374
Portland, OR 97211
Telephone: (917) 717-6401
rshannon@biologicaldiversity.org

Chelsea Stewart-Fusek, *pro hac vice application pending*
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 11374
Portland, OR 97211
Telephone: (971) 717-6425
cstewartfusek@biologicaldiversity.org

*Attorneys for Plaintiff*